## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **MPI CORP.,** : | |
| **Plaintiff,** : | |
| : | |
| **v.** : | |
| : | **No. 3:02CV1212 (DJS)** |
| **LEARNFRAME, INC.,** : | |
| **Defendant.** : | |
| : | |

### <u>MEMORANDUM OF DECISION</u>

MPI Corporation ("MPI") brings this action for damages arising out of an alleged breach of contract by the defendant, Learnframe, Inc.("Learnframe"). MPI seeks summary judgment **[doc. #31]** and damages in the amount of $485,775.62. The defendant argues that summary judgment should be denied because genuine issues of material fact exist regarding the four affirmative defenses raised in this case. The motion is **GRANTED in part**.

### <u>Facts</u>

This action is based on a transaction between the plaintiff, MPI Corp. ("MPI"), the defendant, Learnframe, Inc. ("Learnframe") and Thomson Learning Inc., ("TLI") an affiliate of Thomson Corporation ("Thomson"). MPI seeks to recover from Learnframe $485,775.62 in combined principal and interest owed on a note (the "Loan Agreement") executed in association with a separate transaction between Learnframe and TLI.  MPI, an Arizona corporation with an office in Stamford, CT, was, at the time of the events related here, a subsidiary of Medical Economics Company, Inc. ("MEC"), which itself is a subsidiary of Thomson. MPI never possessed a certificate of authority from the secretary of the state to do business in Connecticut.

MPI merged with MEC on December 11, 2002.

Learnframe is a software development company that created a program called NEBO for use in the publishing industry. On December 21, 2000, Learnframe entered into a contract with NETg, a subsidiary of Harcourt, Inc. ("Harcourt") to develop and license NEBO. According to Learnframe, NETg, on October 27, 2000, was purchased by as a part of Thomson's acquisition of Harcourt. TLI contacted Learnframe and offered a deal whereby Learnframe could continue to develop NEBO for use by TLI.[1] The Software License and Strategic Alliance Agreement ("Software Agreement") between TLI and Learnframe granted TLI a non-exclusive license for the use of NEBO. Learnframe would install NEBO on TLI's systems and receive fees for consulting, technical support and training. The Software Agreement is dated May 4, 2001.

A second contract between TLI and Learnframe was executed on May 25, 2001. TLI agreed to pay Learnframe $2,550,000 in exchange for joint ownership of NEBO ("Joint Ownership Agreement"). As part of the Joint Ownership Agreement, TLI agreed not to exploit its ownership rights for a period of one year from the date of the contract, until May 25, 2002. The agreement gave Learnframe, during the one year period of restricted ownership, the right to repurchase TLI's ownership interest according to one of three different methods. Learnframe could repurchase if it: 1) raised at least $15,000,000 through an offering of private equity securities; 2) maintained a net worth of $10,000,000 for a period of at least two months; or 3) offered to repay the original purchase price and to simultaneously repay the loan made pursuant

---

[1]Learnframe states that as part of its original deal with NETg it offered NETg a non-exclusive license to NEBO in exchange for the payment of royalties in the sum of $1,000,000 per year for three years. Learnframe placed the NEBO software in escrow for NETg in the event that Learnframe ceased business or ceased to produce and support NEBO. NETg had no ownership rights in the software that could be transferred to Thomson as the successor in interest.

to a loan agreement executed at the same time as the Joint Ownership Agreement.[2] The restrictions on TLI's ownership of NEBO were scheduled to end either at the occurrence of some default event[3] or on May 25, 2002, at which time Learnframe's repurchase rights expired. Once the restrictions terminated, Learnframe and TLI would each receive a complete copy of NEBO and be free to modify, develop or create new versions of the software independent of the other party and with full rights to the resulting new product.

The Loan Agreement called for MPI to loan Learnframe $451,726. A second loan of $2,000,000 was scheduled to issue either when Learnframe raised $15,000,000 in equity or when MPI was satisfied that Learnframe had made sufficient progress toward raising the fifteen million dollars. The second loan has not been distributed. The note matured one year from the date of the Agreement, May 25, 2002. Learnframe was obligated to pay back the loan in full at that time, with interest computed according to the terms of the Agreement.

The NEBO software was placed in an escrow account for the duration of the one year restricted ownership period. Both TLI and MPI are listed as beneficiaries pursuant to the Escrow Agreement. The release of the software from escrow was determined by reference to the Joint Ownership Agreement and the Loan Agreement. Assuming that the conditions of both agreements were satisfied, the software was to be distributed under the terms of the Joint Ownership Agreement. A default by either party on either contract would alter the distribution of

---

[2]There is ambiguous language at the end of the repurchase paragraph that makes simultaneous repayment of the MPI loan a condition precedent to TLI's obligation to complete the repurchase. The court is uncertain if the language was intended to apply that condition to all three options for repurchase.

[3]A default event is defined as a failure to meet the conditions of the Joint Ownership Agreement, or as a failure to meet any condition of the Loan Agreement.

the software according to the terms of the Escrow Agreement. Neither party claims that either the

Joint Ownership Agreement or the Loan Agreement was breached, excepting the failure to remit

payment on the loan that gives rise to this action.

The relationship between the Loan Agreement, the Joint Ownership Agreement and the

Software Agreement is not fully explained by the parties. The Joint Ownership Agreement is, on

its face, executed separately and without regard for the Software Agreement. The Loan

Agreement is explicitly referenced in the Joint Ownership Agreement and not the Software

Agreement; however, the Loan Agreement contains references to the Software Agreement that

are germane to the present inquiry.

The definitions set forth in Appendix A to the Loan Agreement defines the "Loan

Documents" as:

> [T]his agreement, the Notes, the Patent and Trademark Agreements, the
> Copyright Agreement, the Security Agreement, the Source Code Escrow
> Agreement, the Software License Agreement, the Assignment Agreement and any
> other agreements, instruments, and documents heretofore, now or hereafter
> evidencing, securing, guaranteeing, or otherwise relating to the Obligations, the
> Collateral, or any other aspect of the transactions contemplated by this
> Agreement.

The Loan Agreement further defines the Software License Agreement as the "Software License

and Strategic Alliance Agreement dated as of May 4, 2001, between [Learnframe] and Thomson

Learning Inc., an Affiliate of [MPI]." According to the Loan Agreement, the continued operation

of the Software License Agreement was a condition precedent for the loan. Further, the Loan

Agreement defined an "event of default" as "any default…in the observance or performance of

any of the other covenants or agreements contained in any other Section of this Agreement or any

other Loan Document."

Learnframe states that it had a series of disagreements with TLI regarding the installation of NEBO that led TLI to seek an alternate vendor by December 2001. TLI has not paid Learnframe any of the fees due under the Software Agreement. Learnframe refused to meet its obligations under the Loan Agreement when the note matured on May 25, 2002. No money has been paid to MPI. The parties do not dispute that interest has continuously accrued since May 25, 2002.

### Standard of Review

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). "Only when reasonable minds

could not differ as to the import of the evidence is summary judgment proper." Id.

A party may not, however, avoid summary judgment through "mere speculation and conjecture." Harlen Associates v. Incorporated Village of Mineola, 273 F.3d 494, 499 (2d.Cir. 2001). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

## Discussion

MPI instituted the present action to recover the principle and interest owed by Learnframe under the Loan Agreement. The parties agree that there is no genuine issue of material fact regarding either Learnframe's obligation or the failure to pay back MPI's loan. Learnframe argues that it has shown material issues of fact as to each of its four affirmative defenses and a trial is required on those defenses before judgment can be rendered on MPI's claim. Learnframe argues first that MPI may not bring this suit in Connecticut because it lacks a certificate of authority from the Connecticut secretary of state. Second, Learnframe alleges that MPI was used as the alter ego of TLI for the purpose of permitting TLI to collect on the loan even though TLI's failure to perform under the Software Agreement would otherwise excuse Learnframe's non-performance of its obligations under the Loan Agreement. Learnframe asks the court to pierce MPI's corporate veil and find TLI to be the real party in interest. Third, Learnframe contends that TLI's failure to perform under the Software Agreement is sufficient to offset some of Learnframe's obligation under the Loan Agreement. Finally, Learnframe contends that MPI, as a dissolved corporation, has no standing to bring this lawsuit.

The court will first address the defenses, standing and lack of a certificate of authority,

that concern MPI's ability to maintain this action before considering the defenses, piercing the corporate veil and the right to offset, that are related to the underlying contract obligations.

### I. Standing

Learnframe raises, as affirmative defenses, two separate claims that MPI is barred from prosecuting this suit. First, Learnframe argues that MPI cannot maintain this suit as a dissolved corporation. Second, it is argued that MPI is barred from the use of Connecticut's courts because it lacks a certificate of authority to conduct business in Connecticut. Neither claim has merit.

The dissolution of a corporation does not "abate or suspend a proceeding pending by or against the corporation on the effective date of dissolution." Conn.Gen.Stat. §33-884(b)(6) There is no dispute that MPI filed the present action on July 15, 2002, nearly six months before the December 11, 2002 dissolution. MPI has standing despite its dissolution.

The issue of MPI's authority to conduct business in Connecticut is more difficult. Section 33-920(a) requires all foreign corporations that are not insurance, surety or indemnity companies to acquire a certificate of authority to transact business from the secretary of the state. A foreign corporation transacting business without a certificate is barred from maintaining an action in any court in the state of Connecticut until a certificate is acquired. Conn.Gen.Stat. §33-921. It is undisputed that MPI does not have a certificate of authority to transact business.

The Connecticut legislature has limited §33-920 by exempting certain types of transactions from the certificate requirement. Section 33-920(b)(7) exempts from the "transacting business" definition any action "creating or acquiring indebtedness, mortgages and security interests in real or personal property." Section 33-920(b) exempts isolated transactions that are completed within thirty days and are not "one in the course of repeated transactions of a like

nature." The question of "whether a foreign corporation is transacting business so as to require a certificate of authority" is one "which must be resolved by examining the complete factual circumstances of each case." Peters Production, Inc. v. Dawson, 182 Conn. 526, 529 (Conn. 1980). The list of acts excluded from the definition of transacting business in §33-920(b) is not exclusive. Conn.Gen.Stat. §920(c).

The totality of the facts presented here, facts which are not in dispute, does not support Learnframe's contention that MPI was conducting business without a certificate of authority. It is true that MPI listed its principal place of business as Stamford, but there is absolutely no other evidence presented that would permit the court to infer, or Learnframe to prove, that MPI was conducting business in Connecticut.  There are no financial records, business records or transaction records present other than the loan from MPI to Learnframe. The evidence is sufficient to show that MPI had an office in Connecticut and that its sole act of business in the state was to loan money to Learnframe as part of a larger transaction. The loan does not appear to be part of a similar series of transactions, and although the deal was not completed within thirty days the record shows the loan to be an isolated transaction.

The list of exemptions in §33-920(b) is not exclusive and this transaction, while not on the list, is a hybrid of other exempted activities and is exempted pursuant to §33-920(c). MPI created an indebtedness in a limited and isolated transaction that was not part of a continuing series.[4] The sole evidence that MPI was improperly conducting business in Connecticut is the existence of an office in Stamford, and that is not sufficient to prove Learnframe's affirmative

---

[4]The fact that the loan was intended to be made in two disbursements does change a single loan into a series of discrete transactions.

defense. MPI's acts are protected by the safe harbor provisions of §33-920(b)-(c) and it may pursue this action.

## II. Piercing the Corporate Veil

Learnframe argues that the court should pierce the corporate veil of MPI and treat TLI as the true party in interest to the debt that gives rise to this action. Learnframe contends that TLI used MPI as a shield to protect it from liability for its breach of the Software Agreement. Accordingly, Learnframe seeks to offset or avoid its obligations to MPI in the name of recovering some of its losses from TLI.

Connecticut law follows the general rule that the corporate veil is pierced only under exceptional circumstances. Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc., et. al., 187 Conn. 544, 557 (Conn. 1982). The power to disregard the corporate form is equitable, and is usually exercised only "where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." Id.(quoting Newberry v. Barth, Inc., 252 N.W.2d 711, 714 (Iowa 1977)); see also, United Electrical Contractors, Inc. v. Progress Builders, Inc., 26 Conn.App. 749, 755 (Conn.App.Ct. 1992)(noting that "[w]hen the statutory privilege of doing business in the corporate form is employed as a cloak for the evasion of obligations, as a mask behind which to do injustice, or invoked to subvert equity, the separate personality of the corporation will be disregarded.") "The key factor in any decision to disregard the separate corporate entity is the element of control or influence exercised by the individual sought to be held liable over corporate affairs." Angelo, 187 Conn. at 556.

Connecticut has adopted two tests that courts may apply when asked to pierce the

corporate veil. The first is known as the 'instrumentality' test:

> The instrumentality rule requires, in any case but an express agency, proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; and (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

Zaist v. Olson, 154 Conn. 563, 575 (1967).

The facts of this action, taken in the light most favorable to Learnframe, the non-moving party, simply do not meet the standard of the instrumentality test. Learnframe offers no evidence that TLI controlled MPI so thoroughly that MPI lacked a will of its own as to the relevant transaction. There is no evidence in the record that MPI and TLI share directors or officers.[5] There is no evidence that MPI did not have legitimate corporate meetings, that it did not follow the laws regulating corporate behavior or that MPI did not have a business purpose separate from TLI. Learnframe offers no evidence that MPI was coerced into the transaction by TLI or that MPI was incapable of receiving a benefit from the deal. At best, the facts show that MPI, as a an affiliate of TLI, was invited to offer the loan by its corporate brother, an action that is neither unusual nor illicit.

Even were the court to assume that MPI did lack a will separate from TLI when it entered into the loan agreement with Learnframe, there is still no evidence in the record to satisfy the

---

[5]Learnframe offers as evidence of joint directors the affidavit of Michael Memmott, who asserts the necessary facts. The remainder of the record, including the corporate disclosure statements and annual reports submitted by the defendant, shows that MPI and TLI did not share directors or officers. If the two companies did share officers or directors at some time in the years prior to 1999, the record does not reflect it.

wrongful purpose or fraud prongs of the instrumentality test. Learnframe hints that TLI brought MPI into the larger transaction solely to provide TLI with legal cover for its unannounced plan to violate the Software Agreement, but there is no evidence to support this suggestion and the court will not presume fraud in the absence of corroborating evidence. Finally, assuming *arguendo* that there is evidence that MPI was an instrument of TLI in this transaction, there is an inadequate connection between the loan and the injury suffered by Learnframe. The defendant does not dispute that it entered into the Loan Agreement with MPI of its own accord in an arms-length transaction. The injuries alleged by Learnframe all derive from a possible breach of the Software Agreement by TLI. There is absolutely nothing in the record to show that Learnframe was in any way injured by the loan or by MPI. Indeed, the Loan Agreement makes breach of the Software Agreement an act of default and so, regardless of whether TLI or MPI is the actual source of the loan, Learnframe is protected by the terms of the deal from any malicious acts by TLI. There is no basis for piercing the corporate veil.

The second test used in Connecticut when a court is asked to disregard the corporate form is the identity test. "The identity rule primarily applies to prevent injustice in the situation where two corporate entities are, in reality, controlled as one enterprise because of the existence of common owners, officers, directors or shareholders and because of the lack of observance of corporate formalities between the two entities." Angelo Tomasso, 187 Conn. at 560. The Connecticut Supreme Court has defined the identity rule as follows:

> If plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise.

-11-

Saphir v. Neustadt, 177 Conn. 191, 210 (1979)(quoting Zaist, 154 Conn. at 576). see Kregos v. Latest Line, Inc., 929 F. Supp. 600, 604 (D. Conn.) ("The identity rule is usually applied in situations where two corporate entities are controlled as one enterprise because of the existence of common shareholders, directors and officers and the lack of observance of corporate formalities. . . . This rule, however, has also been applied to find individual stockholders liable."), vacated in part, 951 F. Supp. 24 (D. Conn. 1996). Generally speaking, the identity rule imposes liability when two corporations or a corporation and an individual should properly be considered one in the same. See Zaist, 154 Conn. at 578 ("The court could, with equal propriety, reach the conclusion that the identity of Olson and Olson, Inc. was such that a judgment against Olson, Inc. [and Olson] was warranted.").

The facts of this case have been discussed and it is clear that there is no basis for a finding that TLI and MPI are a single entity in this transaction. There is no overlap between the officers and directors of TLI and those of MPI. The record does not contain any evidence that TLI and MPI share a unity of interest in this action, such that TLI would benefit through MPI as a result of TLI's actions. Nor is there evidence that TLI is protected from liability for breach of the Software Agreement by virtue of MPI's actions or the terms of the Loan Agreement. Learnframe is entitled to maintain an action against TLI for breach of contract, if TLI breached the Software Agreement. MPI's role in the loan does nothing to alter Learnframe's rights. Learnframe has not offered sufficient evidence to pierce the corporate veil under the identity test.

### III. The Claim for an Offset of Damages

The Loan Agreement contains an explicit provision that makes a failure to observe the conditions of the Software Agreement an act of default under the Loan Agreement. Thus, if TLI

were in breach of the Software Agreement, Learnframe would be entitled to an action for breach

of contract and it would have a defense against enforcement of the Loan Agreement. Learnframe

has not offered any clear evidence that TLI breached the Software Agreement. Learnframe offers

no communications between the parties, no invoices or receipts and no business records of any

kind to substantiate its assertion that TLI insisted on "unreasonable" performance. The only clear

example of an alleged contract breach is Learnframe's assertion that TLI's insistence on software

testing by an outside firm in November 2001 was unreasonable, and Learnframe does not explain

how or why this requirement was unreasonable.

Despite the paucity of evidence presented by Learnframe, the court finds that it cannot

grant summary judgment to MPI on the issue of the defendant's right to offset damages.

Connecticut law provides that whether an alleged breach of contract is material is a question of

fact for the jury. Miller v. Guimaraes, 78 Conn.App. 760, 767 (Conn.App.Ct. 2003). The record

shows that the Software Agreement does not clearly define the duties of the parties and also lacks

deadlines applicable to Learnframe's work. In light of the ambiguity of the Software Agreement,

Learnframe has presented sufficient issues of fact to survive summary judgment. "If the

agreement is subject to more than one reasonable interpretation and extrinsic evidence of the

actual intent of the parties exists, then the contract's meaning becomes an issue for the

factfinder." Brunoli v. Brunoli & Sons, 993 F.Supp. 66, 73 (D.Conn. 1997). Learnframe is

entitled to show that TLI's assertion of breach and subsequent termination of the contract was

unwarranted and itself a breach of contract. If Learnframe can show a breach of the Software

Agreement then, according to the unambiguous terms of the Loan Agreement, it might be entitled

to offset the damages owed to MPI. The amount of such offset would also be an issue for trial.

-13-

## <u>Conclusion</u>

Defendant's motion for summary judgment **[doc. #31]** is **GRANTED in part**.

Learnframe is entitled to trial on its affirmative defense alleging a breach of the Software

Agreement by TLI. According to the terms of the Loan Agreement, such a breach could provide a

basis for Learnframe to offset the damages it owes to MPI. The plaintiff is granted summary

judgment on Learnframe's other affirmative defenses.

       **IT IS SO ORDERED** at Hartford, Connecticut, this __11th__ day of April, 2005.

                        _____**/s/DJS**_____

                        **DOMINIC J. SQUATRITO**
                        **UNITED STATES DISTRICT JUDGE**